**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2381
_____

VICTOR ZAVALA; EUNICE GOMEZ;
MAXIMILIANO MENDEZ;
CARLOS ALBERTO TELLO; ANTONIO FLORES;
OCTAVIO DENISIO;
MARTIN MACAK; PAVEL KUNC;
HANA PFAUSEROVA;
JIRI PFAUSER; TERESA JAROS; PETR ZEDNEK;
DANIEL ANTONIO CRUZ; LUIS GUTIERREZ;
FILIPE CONDADO;
ARTURO ZAVALA; HIPOLITO PALACINOS,
                                          Appellants

v.

WAL MART STORES INC.
_____

On Appeal from the United States District Court
for the District of New Jersey
District Court  No. 2-03-cv-05309
District Judge: Honorable Garrett E. Brown, Jr.

Argued March 26, 2012
Before: FUENTES, SMITH, and JORDAN,
*Circuit Judges*

(Filed: August 9, 2012)

Gilberto M. Garcia
Garcia & Kricko
Court Plaza South
West Wing, 3rd Floor
Hackensack, NJ  07601

James L. Linsey                    (Argued)
Suite 615
11 Broadway
New York, NY  10004

Michaelene Loughlin
Loughlin & Latimer
179 Cedar Lane
Suite B
Teaneck, NJ  07666
        *Counsel for Appellants*

Thomas H. Golden
Willkie, Farr & Gallagher
787 Seventh Avenue
New York, NY  10019

David P. Murray          (Argued)
Willkie, Farr & Gallagher
1875 K Street, N.W.
Washington, DC  20006
        *Counsel for Appellee*

————————

OPINION

————————

SMITH, *Circuit Judge.*

## I.    Introduction

This suit was brought in the U.S. District Court for the District of New Jersey by Wal-Mart cleaning crew members who are seeking compensation for unpaid overtime and certification of a collective action under the Fair Labor Standards Act (FLSA), civil damages under RICO, and damages for false imprisonment.  The workers – illegal immigrants who took jobs with contractors and subcontractors Wal-Mart engaged to clean its stores – allege:  (1) Wal-Mart had hiring and firing authority over them and closely directed their actions such that Wal-Mart was their employer under the FLSA; (2) Wal-Mart took part in a RICO enterprise with predicate acts of transporting illegal immigrants,

harboring illegal immigrants, encouraging illegal immigration, conspiracy to commit money laundering, and involuntary servitude; (3) Wal-Mart's practice of locking some stores at night and on weekends – without always having a manager available with a key – constituted false imprisonment.

Over the course of eight years and a minimum of four opinions, the District Court rejected final certification of an FLSA class, rejected the RICO claim on several grounds, and rejected the false imprisonment claim on the merits. We will affirm.

## II.   Facts

This case has been pending for over eight years and ultimately comes to us from a grant of summary judgment. Not surprisingly, it carries with it a substantial record.[1]  To help organize the relevant facts in a useful

---

[1] This case provides a useful example of why the Federal Rules of Appellate Procedure provide for a *joint* appendix and give each party the authority to designate any relevant documents for inclusion. *See Fed. R. App. P.* 30(b)(1).  Rather than cooperate to produce a joint appendix, the parties here have provided one primary appendix and two sets of supplemental appendices (one from each side).  This unnecessarily complicates the record on appeal, and we strongly discourage parties from pursuing such a course in the future.

manner, we have divided them into groups corresponding to Plaintiffs' claims.  We focus only on the facts relevant to our bases for deciding the appeal.

### A.    RICO

Plaintiffs allege that Wal-Mart paid its contractors with full knowledge that the contractors were hiring illegal immigrants to work in Wal-Mart's stores. Plaintiffs support this contention with further allegations that two senior Wal-Mart executives made comments that could be understood as acknowledging that the contractors had hired and would continue to hire illegal immigrants.  In addition, Plaintiffs allege that Wal-Mart managers and executives were regularly informed that their contractors were employing illegal immigrants.

In support of their RICO transporting predicate, Plaintiffs allege that contractors would sometimes pick workers up from the airport and transport them across state lines for work.  They also allege that when a work crew was arrested by federal authorities, fired / ejected by the store manager, or otherwise unavailable to work, another work crew would be brought in within hours, often from out of state.  In support of their RICO harboring predicate, Plaintiffs allege at least one instance in which work crews were permitted to sleep in the store and keep their personal belongings there with the knowledge of store management.  In support of their RICO encouraging predicate, Plaintiffs allege that

5

contractors advertised for Wal-Mart cleaning jobs in the Czech Republic and elsewhere. In support of their RICO involuntary servitude predicate, Plaintiffs allege that they were coerced into working by threats to report their immigration status to authorities. Plaintiffs also use the facts supporting their false imprisonment claims to support their involuntary servitude claims. Those facts will be discussed below.

The record indicates that Plaintiffs did not work exclusively for Wal-Mart, nor did Wal-Mart hire its cleaners exclusively from the pool of illegal immigrants it allegedly transported, harbored, and encouraged. For example, documents and deposition testimony provided by Plaintiffs demonstrate that they held a variety of jobs, including work at a Marriott hotel, work at a movie theater, and work remodeling homes. And the record indicates that Wal-Mart often used store associates (regular, non-contract employees) to clean its stores.

### B.     *Certification of the FLSA Collective Action*

The District Court's decision to decertify the collective action followed substantial discovery into the potential class plaintiffs, their employment history, their work hours, their working conditions, and other relevant factors. Magistrate Judge Arleo, to whom some of the proceedings below were assigned, required each opt-in plaintiff to file a questionnaire in a specific format detailing his / her personal information, working

6

conditions, compensation, etc. Over one hundred individuals filed this questionnaire before the deadline. The questionnaires demonstrate that the opt-in plaintiffs worked at dozens of different stores, for numerous different contractors, with various pay amounts and methods. Though most worked every evening from roughly 11pm – 7am, their hours sometimes varied.

In an effort to demonstrate that the proposed class is similarly situated, Plaintiffs proffer a Wal-Mart Maintenance Manual (and a translation of that manual into Polish), which appears to establish uniform standards and procedures for cleaning Wal-Mart stores. The manual is comprehensive. Among other things, it specifies the products and methods to be used, as well as the procedure for obtaining new supplies or equipment. In a similar vein, Plaintiffs provide declarations and deposition testimony establishing that Wal-Mart provided the cleaning materials used by the crew, though at least one Wal-Mart store manager asserts that contractors provided their own equipment.

In an effort to demonstrate that Wal-Mart exercised control over the proposed class and that this control was common across Wal-Mart stores, Plaintiffs provide declarations and deposition testimony supporting their contention that Wal-Mart managers directed them where and how to clean and often scrutinized their work, requiring them to clean an area more thoroughly before

leaving. Wal-Mart provides declarations from store managers insisting that their interactions with crews were limited to general instructions. They insist that they did not supervise the cleaners and that issues were usually raised with the crew chief or the contracting company. Plaintiffs concede in their own deposition testimony that cleaners did not receive training from Wal-Mart staff. Generally, cleaners were trained by other members of the work crew or learned simply by observing.

Plaintiffs also claim that Wal-Mart asserted and exercised the right to hire and fire the cleaning crews. Plaintiffs point first to a form contract distributed to Wal-Mart stores to be used in hiring cleaning crews. The letter accompanying the contract and the contract itself specify that the Wal-Mart store manager shall have final authority to approve or disapprove members of the cleaning crew. In addition, Plaintiffs provide declarations and deposition testimony establishing that Wal-Mart management would occasionally fire individual workers or whole work crews. Multiple Wal-Mart managers provide declarations asserting that they did not have the authority to hire and fire crew members.

### C. False Imprisonment

In support of their false imprisonment claims, Plaintiffs allege that they often worked at stores that were shut down at night and on weekends, during which time the exits were locked. At these stores, they needed to

seek out managers to open the doors. Managers were often unavailable and were sometimes not even in the store. However, Plaintiffs' deposition testimony shows that they could and sometimes did leave for breaks. Testimony also shows that they occasionally left for work-related tasks like retrieving propane (necessary for the buffing equipment).

Plaintiffs cite two specific instances in which they wanted to leave but were unable to do so: (1) Plaintiff Petr Zednik had a toothache and wanted to leave early, but his manager, Steve, refused to permit him to leave; (2) Plaintiff Teresa Jaros had abdominal pain and bleeding and wanted to leave, but no managers were in the store. In Zednik's case, he further asserts that "Steve is a muscular man (with blond hair), and I knew that he would assault me if I tried to escape through any door that would let me out[.]"

In response, Wal-Mart provides two declarations from store managers. The declarations attest that managers were available to unlock doors "when necessary"; that the stores had properly-marked emergency exits; and that – to the managers' knowledge – the emergency exits were neither concealed nor obstructed at any time and were always in proper working order.

In reply to these declarations, Plaintiffs assert that managers were often unavailable. They also assert that

they did not know how to leave. Plaintiffs claim that they were never informed of the location of emergency exits. Plaintiffs also speculate that Wal-Mart had motive to conceal these exits.

### III. Procedural Timeline

The initial complaint in this case was filed on November 10, 2003, and the case was assigned to then-District Judge Joseph A. Greenaway, Jr. The original complaint was followed by a First Amended Class Action Complaint on February 2, 2004. This complaint sought damages for: (1) RICO (with predicate acts of transporting, harboring, encouraging, and hiring illegal immigrants, conspiracy / aiding and abetting transporting, harboring, and encouraging illegal immigrants, committing immigration offenses for financial gain, involuntary servitude, money laundering, mail and wire fraud, and conspiracy to launder money); (2) RICO conspiracy; (3) conspiracy to violate civil rights under 42 U.S.C. § 1985; and (4) violations of the Fair Labor Standards Act. On December 29, 2004, the District Court conditionally certified the FLSA collective action.

On October 7, 2005, ruling on a motion to dismiss, the District Court concluded that: (1) Plaintiffs failed to state a claim for any of their alleged RICO predicates; (2) Plaintiffs were not members of a class protected by 42 U.S.C. § 1985; and (3) Plaintiffs' FLSA and false

imprisonment claims could proceed. In response, Plaintiffs filed a Second Amended Complaint on November 21, 2005. This complaint abandoned Plaintiffs' civil rights claim under 42 U.S.C. § 1985, the RICO predicate of hiring illegal immigrants, the RICO predicate of money laundering (but not conspiracy to launder money), and the RICO predicate of mail and wire fraud.

On August 28, 2006, deciding a partial motion to dismiss the Second Amended Complaint, the District Court dismissed Plaintiffs' RICO and RICO conspiracy claims. The District Court held: (1) Plaintiffs failed to satisfy the RICO requirement of showing "distinctness" between the "person" and the "RICO enterprise"; (2) Plaintiffs failed to state a claim for their RICO predicate of involuntary servitude; and (3) Plaintiffs failed to establish a causal nexus between their RICO predicates of immigration violations and money laundering and their alleged injury.

On March 10, 2010, this case was reassigned to then-Chief District Judge Garrett E. Brown, Jr. On June 25, 2010, the District Court granted Wal-Mart's motion to decertify Plaintiffs' provisionally-certified FLSA collective action. The District Court concluded that the breadth of factual circumstances underlying each individual's claim did not permit trial of the case as a collective action. On December 1, 2010, the District

11

Court denied Plaintiffs' motion for summary judgment on their FLSA and false imprisonment claims. The District Court concluded that the motion was procedurally improper because it was filed well beyond the deadline provided by the federal rules. The District Court also concluded that the motion failed on the merits because material facts remained in contention on both claims.

On April 7, 2011, the District Court granted Wal-Mart's motion for partial summary judgment on the false imprisonment claim. It first concluded that Wal-Mart had shown adequate grounds for seeking summary judgment beyond the time limit provided by the federal rules. It then held that Plaintiffs' false imprisonment claims failed on the merits because Wal-Mart had adequately demonstrated the availability of emergency exits and Plaintiffs failed to rebut this evidence. Following that decision, Wal-Mart resolved the individual FLSA claims of named Plaintiffs through a series of settlements and an offer of judgment.

This appeal followed. Plaintiffs challenge the District Court's dismissal of their RICO claims, its decertification of the conditionally-certified FLSA action, and its grant of summary judgment for Wal-Mart on Plaintiffs' false imprisonment claims. The District Court had jurisdiction under 28 U.S.C. § 1331, 29 U.S.C.

§ 216(b), 18 U.S.C. § 1964(c), and 28 U.S.C. § 1367(a). We have appellate jurisdiction under 28 U.S.C. § 1291.

## IV. Analysis

### *A. Certification of the FLSA Collective Action*

The District Court conditionally certified this as a collective action under the FLSA. Following discovery, a "motion for decertification" was brought, and the District Court "decertified"[2] the class. As the District Court explained, two different standards apply for certification under the FLSA, one for conditional certification, and another for final certification. While we have made clear that the standard for final certification is more stringent than the standard for conditional certification, the exact test to be applied has been left specifically unresolved by our Court. We decide today that to certify an FLSA collective action for trial, the District Court – after considering the claims and defenses of the parties and all the relevant evidence – must make a finding of fact that the members of the collective action are "similarly situated." The burden of demonstrating that members of the collective action are similarly situated is to be borne by the plaintiffs, who must show by a preponderance of the evidence that they are similarly situated.

---

[2] This terminology is misleading, as we will demonstrate.

13

## 1. Standard of Review

We must first address the appropriate standard of review. The standard of review for FLSA decertification has not been previously addressed by our Court. Other circuits have applied an abuse of discretion standard to the ultimate decision on whether to certify the collective action. *See, e.g.*, *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008) ("[W]e review a district court's § 216(b) certification for abuse of discretion."); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (same in ADEA context).[3]

We agree that an abuse of discretion standard is appropriate. But we note that this is not the type of abuse of discretion review afforded matters that are "committed to the discretion of the trial court[.]" *United States v. Criden*, 648 F.2d 814, 817 (3d Cir. 1981). In those situations, we will reverse only if the district court's decision is "arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the local court." *Lindy Bros. Builders*, *Inc. v. Am.*

---

[3] *Thiessen* is an ADEA case. Throughout this section, we will use FLSA and ADEA cases interchangeably, as the ADEA imports by reference the collective action provision and "similarly situated" standard of the FLSA. *See* 29 U.S.C. § 626(b).

*Radiator, Etc.*, 540 F.2d 102, 115 (3d Cir. 1976) (en banc) (quoting *Delno v. Market St. Ry. Co.*, 124 F.2d 965, 967 (9th Cir. 1942)).  Here, however, we will find an abuse of discretion "if the district court's decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'"  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001)).

This type of review is appropriate because the final certification of an FLSA collective action is composed of two underlying components:  (1) determining the legal standard to be applied in concluding whether proposed plaintiffs are similarly situated; and (2) applying the legal standard to conclude whether the proposed plaintiffs actually are similarly situated.  The former has been recognized as a legal question, subject to *de novo* review. *See Thiessen*, 267 F.3d at 1105 ("The initial question, which we address *de novo*, is whether it was proper for the district court to adopt the *ad hoc* approach in determining whether plaintiffs were 'similarly situated' for purposes of § 216(b).").  The latter has been recognized as a factual question, subject to review for clear error.  *See Morgan*, 551 F.3d 1260 ("A court's determination that the evidence shows a particular group of opt-in plaintiffs are similarly situated is a finding of fact. . . . We will reverse the district court's fact-finding

15

that plaintiffs are similarly situated only if it is clearly erroneous."); *Mooney v. Aramco Servs.*, 54 F.3d 1207, 1214 (5th Cir. 1995) ("At [the second] stage, the court . . . makes a factual determination on the similarly situated question."), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

Once it has been determined that the plaintiffs are similarly situated (a factual question reviewed for clear error), there is no further work to be done. We do not believe that the statute gives the district court discretion to deny certification after it has determined that plaintiffs are similarly situated. Accordingly, no exercise of discretion actually takes place. Nonetheless, such multi-part reviews of District Court decisions have been routinely labeled with the "abuse of discretion" standard under our precedent and the precedent of our sister circuits, though we have made clear that each part of the review should proceed under the appropriate standard for that component. *See, e.g.*, *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 262 (3d Cir. 2011); *Morgan v. Perry*, 142 F.3d 670, 682-83 (3d Cir. 1998).

Because we are examining the underlying legal rule for certification, we exercise plenary review over the District Court's decision to not finally certify the collective action here. Going forward, however, because district courts will be applying the standard we announce today, we anticipate that certification decisions will

16

typically be subject to review under the clear-error prong of this type of abuse of discretion review, as only fact-finding should be at issue.

## 2. Standard for Certification of an FLSA Collective Action

In "decertifying" this collective action, the District Court explained that two different standards for certification applied. It noted that a "fairly lenient standard" applied for conditional certification, and noted that some courts "require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan[.]" *Zavala v. Wal-Mart Stores, Inc.*, No. 03-5309, 2010 WL 2652510, at *2 (D.N.J. June 25, 2010) (quoting *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 495 (D.N.J. 2000)). The District Court then held that a "stricter standard" applied on final certification, in which the court actually determines whether the plaintiffs are similarly situated. And it held that plaintiffs bear the burden of demonstrating that they are similarly situated. Without precisely quantifying the burden borne by the plaintiffs, the District Court then concluded that, under the disparate factual circumstances applicable here, Plaintiffs were not similarly situated, and "decertification" was appropriate.

In *Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189 (3d Cir. 2011), we noted that this two-tier approach,

17

while "nowhere mandated, . . . appears to have garnered wide acceptance." *Id.* at 193 n.5. We implicitly embraced this two-step approach, and we affirm its use here. But we also explained that the "conditional certification" is not really a certification. It is actually "'the district court's exercise of [its] discretionary power, upheld in *Hoffmann-La Roche*, to facilitate the sending of notice to potential class members,' and 'is neither necessary nor sufficient for the existence of a representative action under [the] FLSA.'" *Id.* at 194 (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 n.10 (2d Cir. 2010)). In articulating the standard to be applied at this initial stage,[4] we left open the question of the

---

[4] We adopted the "modest factual showing" standard, under which "a plaintiff must produce some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Symczyk*, 656 F.3d at 193 (citing *Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 WL 22701017, at *3 (E.D. Pa. Nov. 13, 2003)). The Second Circuit has described this initial step as "determin[ing] *whether* 'similarly situated' plaintiffs do in fact exist," while at the second stage, the District Court determines "whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Myers*, 624 F.3d at 555.

standard to be applied on final certification. *Id.* at 193 n.6 ("Because only the notice stage is implicated in this appeal, we need not directly address the level of proof required to satisfy the similarly situated requirement at the post-discovery stage.").

It is clear from the statutory text of the FLSA that the standard to be applied on final certification is whether the proposed collective plaintiffs are "similarly situated."[5]  Courts have adopted three different approaches for determining whether this is the case. *See Thiessen*, 267 F.3d at 1102-03.  The first is the ad-hoc approach, which considers all the relevant factors and makes a factual determination on a case-by-case basis. To our knowledge, this is the only approach approved by other Courts of Appeals. *See, e.g.*, *Morgan*, 551 F.3d at 1259-62 (11th Cir. 2008); *Thiessen*, 267 F.3d at 1105 (10th Cir. 2001).  The other two approaches are derived from Rule 23 and have only been adopted by district courts. *See Thiessen*, 267 F.3d at 1103.  We have already repeatedly approved the ad-hoc approach, and we do so again today.  *See, e.g.*, *Symczyk*, 656 F.3d at 193 n.6; *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 n.17 (3d Cir. 2007); *Lockhard v. Westinghouse Credit Corp.*, 879 F.2d

---

[5] 29 U.S.C. § 216(b) ("An action to recover the liability prescribed [by this statute] . . . may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.").

19

43, 51 (3d Cir. 1989), *overruled on other grounds by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).

Our Court and the other Courts of Appeals to address the issue have identified many factors to be considered as part of the ad-hoc analysis. Relevant factors include (but are not limited to): whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment. Plaintiffs may also be found dissimilar based on the existence of individualized defenses. *See Ruehl*, 500 F.3d at 288 n.17. This list is not exhaustive, and many relevant factors have been identified. *See* 45C Am. Jur. 2d Job Discrimination § 2184 (listing 14 factors to be considered in determining whether proposed collective action plaintiffs are "similarly situated" under the ADEA).

Finally, we conclude that the burden is on the plaintiffs to establish that they satisfy the similarly situated requirement. *See Symczyk*, 656 F.3d at 193 ("Should the plaintiff satisfy her burden at [the second] stage, the case may proceed to trial as a collective action."); *see also O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584 (6th Cir. 2009) ("The lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs.").

What remains unresolved is the level of proof the plaintiffs must satisfy. In *Symczyk*, we specifically declined to answer this question. *Symczyk*, 656 F.3d at 193 n.6 ("Because only the notice stage is implicated in this appeal, we need not directly address the level of proof required at the post-discovery stage."). To our knowledge, no other Court of Appeals has directly answered this question.

We now hold that plaintiffs must satisfy their burden at this second stage by a preponderance of the evidence.[6] As the Second Circuit observed, the task on final certification is determining "whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Myers*, 624 F.3d at 555. That seems impossible unless Plaintiffs can at least get over the line of "more likely than not." At the same time, a stricter standard would be inconsistent with Congress' intent that the FLSA should be liberally construed. *See Morgan*, 551 F.3d at 1265 ("We also bear in mind that the FLSA is a remedial statute that should be liberally construed.").

---

[6] Because this issue is necessary to our decision and was not directly addressed in the original briefs, we requested supplemental briefing. Wal-Mart asserted that a preponderance standard applied. In their brief, the Plaintiffs did not articulate a precise burden. But at oral argument, both parties agreed that a preponderance of the evidence standard was appropriate.

Our conclusion that preponderance of the evidence is the appropriate standard to apply is buttressed by the Supreme Court's presumption "that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'" *Grogan v. Garner*, 498 U.S. 279, 286 (1991). And we have said that "[w]e see no reason to deviate from the traditional preponderance of the evidence standard in the absence of express direction from Congress." *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986).

We hold that plaintiffs must demonstrate by a preponderance of the evidence that members of a proposed collective action are similarly situated in order to obtain final certification and proceed with the case as a collective action.

### 3.    Application of the FLSA Certification Standard

Plaintiffs have failed to satisfy the "similarly situated" standard. The similarities among the proposed plaintiffs are too few, and the differences among the proposed plaintiffs are too many.

22

Plaintiffs' theory is that Wal-Mart wanted clean stores "on the cheap."[7] To that end, Wal-Mart distributed a maintenance manual that went into exacting detail about how to clean floors, shelves, bathrooms, and other parts of the store. This manual mandated procedures that all employees and contractors were to use. Store managers also received a form contract for use with outside cleaning contractors, and were instructed that they had final authority to approve or disapprove members of cleaning crews. There is evidence that store managers fired members of cleaning crews and that Wal-Mart employees regularly directed cleaning crews in conducting their work in the store. There is also evidence that Wal-Mart store managers and corporate officers knew and approved of contractors' widespread hiring of illegal immigrants.

---

[7] For purposes of this analysis, we will recite the facts as set forth by the Plaintiffs. This is not required by the certification analysis, but we do so to demonstrate that, even reciting the facts to Plaintiffs' benefit, Plaintiffs are unable to meet their burden for certification. We note that Wal-Mart disputes many of these facts, such as the provenance of the maintenance manual and how widespread was its use, the hiring and firing authority of store managers, etc. We do not purport to resolve these factual disputes either for or against the Plaintiffs or Wal-Mart.

Being similarly situated does not mean simply sharing a common status, like being an illegal immigrant. Rather, it means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA. And, indeed, Plaintiffs' allegation of a common scheme to hire and underpay illegal immigrant workers provides some common link among the proposed class. Plaintiffs' evidence with regard to the maintenance manual, the authority of store managers, and the supervision by store employees is relevant to demonstrating whether Wal-Mart employed the proposed plaintiffs. And such a scheme potentially demonstrates Wal-Mart's willfulness in violating the FLSA. But these common links are of minimal utility in streamlining resolution of these cases. Liability and damages still need to be individually proven.

While the District Court noted the commonalities among the proposed plaintiffs, it was ultimately convinced that the class should not be certified for trial. "In all," it found, "the putative class members worked in 180 different stores in 33 states throughout the country and for 70 different contractors and subcontractors. The individuals worked varying hours and for different wages depending on the contractor." *Zavala*, No. 03-5309, 2010 WL 2652510, at *3 (internal citations omitted). These factors convinced the District Court that there were "significant differences in the factual and

employment settings of the individual claimants." *Id.* The District Court also noted that different defenses might be available to Wal-Mart with respect to each proposed plaintiff, including that individual cleaners were not Wal-Mart employees, as that term is defined by the FLSA, and that it paid some of its contractors an adequate amount to support an appropriate wage for the cleaners. *See id.* at *4-*5.

We agree with the District Court. Considering the numerous differences among members of the proposed class in light of the alleged common scheme's minimal utility in streamlining resolution of the claims, we conclude that the Plaintiffs have not met their burden of demonstrating that they are similarly situated. We will therefore affirm the District Court's decision to deny final certification.

### B. Civil RICO Claims

Plaintiffs originally alleged RICO violations with underlying predicate acts of transporting, harboring, encouraging, and hiring illegal immigrants, mail and wire fraud, money laundering, and related conspiracy and aiding and abetting claims. The District Court then dismissed Plaintiffs' civil RICO claims for failure to state a claim on the underlying predicate acts. *See Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 304 (D.N.J. 2005). When Plaintiffs later amended their complaint, they dropped the predicate acts of hiring illegal

immigrants and mail and wire fraud.  In its subsequent opinion, the District Court took a different approach.  It first held that Plaintiffs had failed to state a claim for the predicate act of involuntary servitude.  But for the other predicate acts – transporting illegal immigrants, concealing illegal immigrants, harboring illegal immigrants, conspiracy / aiding and abetting claims for each of these, and conspiracy to commit money laundering – the District Court held that Plaintiffs had failed to show a causal nexus between these acts and their alleged injury.  It also held that Plaintiffs had failed to satisfy RICO's distinctness requirement.  *See Zavala v. Wal-Mart*, 447 F. Supp. 2d 379 (D.N.J. 2006).  For these independent reasons, the District Court again dismissed Plaintiffs' RICO allegations for failure to state a claim.

In its later opinion, the District Court did not disavow its prior holding that Zavala had failed to plead at least two predicate acts, and Wal-Mart renews this argument on appeal.  *See* Appellee's Br. at 24.  Wal-Mart is correct.  We conclude that Plaintiffs have failed to state a claim for RICO or RICO conspiracy by failing to allege a pattern of predicate acts.[8]

---

[8] We also have serious doubt that the Plaintiffs have met the pleading requirements for RICO distinctness and proximate causation, but we do not need to reach those issues, in light of the pleading deficiency regarding predicate acts.

26

On a motion to dismiss for failure to state a claim, our review is plenary. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

### 1. Pleading of the RICO Conspiracy Claim

In addition to their RICO claim, Plaintiffs also claim conspiracy to violate RICO under 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."). RICO conspiracy is not a mere conspiracy to commit the underlying predicate acts. It is a conspiracy *to violate RICO* – that is, to conduct or participate in the activities of a corrupt enterprise. *See Salinas v. United States*, 522 U.S. 52, 62 (1997) ("Before turning to RICO's conspiracy provision, we note the substantive RICO offense, *which was the goal of the conspiracy*[.]" (emphasis added)); *Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir. 1990) ("[A] defendant can be liable under RICO's conspiracy provision for agreeing to *the commission of a pattern of racketeering activity*." (emphasis added)); *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978) ("[T]he object of a RICO conspiracy is to violate a substantive RICO provision here, to conduct or participate in the affairs of an

27

enterprise through a pattern of racketeering activity and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity."). Plaintiffs fail to plead facts supporting a conclusion that this was the object of the alleged conspiracy. Accordingly, the dismissal of Plaintiffs' claim under Section 1962(d) was not error. It is an entirely separate question whether Plaintiffs allege a conspiracy to commit money laundering or immigration violations, which would then constitute predicate acts for a traditional RICO claim under 18 U.S.C. § 1962(c). We will turn to that contention later in this opinion.

### 2. Pleading of the RICO Predicates

#### a) Pleading of the RICO Involuntary Servitude Predicate

Plaintiffs claim that the conditions of their employment amount to involuntary servitude, barred by 15 U.S.C. § 1584. Per 18 U.S.C. § 1961(1)(B), this is a RICO predicate act. The District Court concluded that Plaintiffs failed to allege a plausible claim of involuntary servitude. We agree.

"[T]he phrase 'involuntary servitude' was intended . . . 'to cover those forms of compulsory labor akin to African slavery[.]'" *United States v. Kozminski*, 487 U.S. 931, 942 (1988) (quoting *Butler v. Perry*, 240 U.S. 328, 332 (1916)). "Modern day examples of involuntary

servitude have been limited to labor camps, isolated religious sects, or forced confinement." *Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 999 (3d Cir. 1993); *see, e.g.*, *United States v. King*, 840 F.2d 1276, 1280 (6th Cir. 1988) (religious sect violated 18 U.S.C. § 1584 where they "used and threatened to use physical force to make the children [at their camp] perform labor and the children believed they had no viable alternative but to perform such labor"); *United States v. Booker*, 655 F.2d 562, 563, 566 (4th Cir. 1981) (migrant labor camp held farm workers in involuntary servitude, forbade them from leaving without paying their debts, and enforced the rule with threats of physical harm, actual physical injury, and by kidnapping and returning to the farm workers who attempted to leave); *Jobson v. Henne*, 355 F.2d 129, 131-32 (2d Cir. 1966) (patients in mental institution performing required labor stated Thirteenth Amendment claim).

Plaintiffs have presented evidence of some difficult working conditions, but they have demonstrated nothing "akin to African slavery" or any modern analogue. Any such comparison is plainly frivolous. Plaintiffs do not allege that they were held in a labor camp or forced into daily labor by a religious sect. Any allegation that their working conditions constituted forced confinement falls with their false imprisonment claims, discussed later in this opinion.

29

To the extent Plaintiffs allege that they were threatened with deportation, those allegations are likewise insufficient to constitute involuntary servitude. In *United States v. Kozminski*, the Supreme Court observed that it was "possible" that threatening an immigrant with deportation might amount to a "threat of legal coercion" resulting in involuntary servitude. 487 U.S. at 948. At the same time, the Court endorsed Judge Friendly's observation in *United States v. Shackney*, 333 F.2d 475 (2d Cir. 1964): "The most ardent believer in civil rights legislation might not think that cause would be advanced by permitting the awful machinery of the criminal law to be brought into play whenever an employee asserts that his will to quit has been subdued by a threat which seriously affects his future welfare but as to which he still has a choice, however painful." *Kozminski*, 487 U.S. at 950 (quoting *Shackney*, 333 F.2d at 487). In *Shackney*, the Second Circuit further held:

> [W]e see no basis for concluding that because the statute can be satisfied by a credible threat of imprisonment, it should also be considered satisfied by a threat to have the employee sent back to the country of his origin, at least absent circumstances which would make such deportation equivalent to imprisonment or worse. . . . [A] holding in involuntary servitude means to us action by the master causing the

30

servant to have, or to believe he has, no way to avoid continued service or confinement, . . . not a situation where the servant knows he has a choice between continued service and freedom, even if the master has led him to believe that the choice may entail consequences that are exceedingly bad. . . . While a credible threat of deportation may come close to the line, it still leaves the employee with a choice, and we do not see how we could fairly bring it within § 1584 without encompassing other types of threat.

333 F.2d at 486-87 (internal citation omitted). We agree with Judge Friendly's analysis. Absent some special circumstances, threats of deportation are insufficient to constitute involuntary servitude.

Plaintiffs do not claim that they were compelled to come to work each day. While they allege that managers often kept them beyond the end of their shift to finish their work, they do not claim that they were forced to remain once that work was finished. The record demonstrates that Plaintiffs often switched jobs, freely moving to different employers in different cities. Plaintiffs do not allege that previous employers ever pursued them to compel their return to a previous position. And while a broad reading of Plaintiffs' allegations could lead to the conclusion that they were

31

threatened with deportation for refusing to work, that is legally insufficient to constitute involuntary servitude. The District Court properly concluded that the Plaintiffs had failed to adequately plead the RICO predicate of involuntary servitude.

### b)  Pleading of the RICO Transporting Predicate

Transporting illegal immigrants is prohibited as follows:

Any person who—

(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to

32

transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law . . .

8 U.S.C. § 1324(a)(1)(A)(i)-(ii). When done for monetary gain, this is a RICO predicate act. *See* 18 U.S.C. § 1961(1)(F).

Plaintiffs allege two types of scenarios that they believe constitute transporting: (1) after work crews were fired or arrested, alternative work crews were quickly made available, often from other states; and (2) work crews were transported to work shifts. Even assuming that any of these actions – had they been taken by Wal-Mart employees – qualify as "transporting,"[9] Plaintiffs do not demonstrate that Wal-Mart was responsible for the transporting. Plaintiffs do not allege that Wal-Mart employees were ever involved in this transport. Plaintiffs do not allege specific facts demonstrating that Wal-Mart aided and abetted transport. Plaintiffs do allege that Wal-Mart managers would sometimes request replacement crews, but they simply assert that the managers knew those crews would be illegal immigrants and that they would be transported

_____

[9] Plaintiffs admit, for example, that many workers entered the United States on visas and were therefore entitled to be here but not to work. Transporting such an individual would not be illegal.

33

across state lines. Even on a motion to dismiss, we are not required to credit mere speculation. *See Twombly*, 550 U.S. at 545.

### c) Pleading of the RICO Encouraging Predicate

Encouraging illegal immigration is prohibited as follows:

Any person who—

. . . .

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; . . .

8 U.S.C. § 1324(a)(1)(A)(iv). When done for monetary gain, this is a RICO predicate act. 18 U.S.C. § 1961(1)(F).

We have held that, to make out a claim of "encouraging," Plaintiffs must prove that Wal-Mart engaged in an "affirmative act that served as a catalyst for aliens to reside in the United States in violation of immigration law when they might not have otherwise." *DelRio-Mocci v. Connolly Properties Inc.*, 672 F.3d 241,

34

249 (3d Cir. 2012); *see also United States v. Henderson*, No. 09-10028, 2012 WL 1432552, at \*17 (D. Mass. Apr. 25, 2012) ("[I]n light of the interpretation of the charging statute recently provided by the Third Circuit in *DelRio-Mocci*, I am satisfied there is no question that those [jury] instructions were erroneous because they were too open textured and did not require the jury to find substantiality to any encouragement or inducement.").

Plaintiffs do not allege that they would not or could not have resided in the United States without having been employed by Wal-Mart. Moreover, while the plaintiffs did make allegations against various cleaning contractors that might be sufficient to state a claim of encouraging, "the complaint fails to allege, as it must, that Wal-Mart took affirmative steps to assist Plaintiffs to enter or remain unlawfully in the United States, or that Wal-Mart agreed to undertake conduct with the purpose of unlawfully encouraging undocumented aliens." *Zavala*, 393 F. Supp. 2d at 308. Thus, Plaintiffs cannot show that Wal-Mart's conduct incited aliens to remain in this country unlawfully when they otherwise might not have done so, and they therefore have not alleged that the company engaged in conduct sufficient to constitute encouraging or inducing.

### d) Pleading of the RICO Harboring Predicate

Harboring illegal immigrants is prohibited as follows:

Any person who—

. . . .

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; . . .

8 U.S.C. § 1324(a)(1)(A)(iii). When done for monetary gain, this is a RICO predicate act. *See* 18 U.S.C. § 1961(1)(F).

Plaintiffs' Second Amended Complaint alleges one set of facts that could plausibly support a claim of harboring. Plaintiffs allege that, at Wal-Mart's store in Kansas City, Missouri, Wal-Mart allowed "undocumented aliens to sleep in a back room in the store and to keep their personal belongings there knowing (or acting in reckless disregard of the fact) that

36

they were undocumented aliens[.]" Giving Plaintiffs the benefit due their complaint on a motion to dismiss, we will assume Plaintiffs are alleging that Wal-Mart thereby provided housing to these cleaners (rather than simply a place to rest).

Even if we assume that these facts support a harboring claim, Wal-Mart cannot be held responsible for the actions of a single store manager in Missouri in allowing illegal immigrants to live in the back of the store while working there as cleaners. Plaintiffs do not claim that this decision was ratified by Wal-Mart senior executives, that it was common practice at Wal-Mart stores, or that it was within the manager's actual or apparent scope of authority. *See United States v. MacDonald & Watson Waste Oil Co.*, 933 F.2d 35, 42 (1st Cir. 1991) ("A corporation may be convicted for the criminal acts of its agents, under a theory of respondeat superior . . . where the agent is acting within the scope of employment."); *United States v. Demauro*, 581 F.2d 50, 54 n.3 (2d Cir. 1978) ("Under a respondeat superior theory of corporate criminal liability, the master's liability would depend on whether the servant's acts were within the 'scope of the employment.' *See* Prosser, Torts 351 (1955). As Professor Prosser has described it, to be within the scope of the employment, the 'servant's conduct' must be 'the kind which he is authorized to perform, occurs substantially within the authorized limits of time and space, and is actuated at least in part, by a

37

desire to serve the master.' *Id.*").  Plaintiffs similarly fail to allege actions by Wal-Mart that would constitute aiding and abetting of harboring.

### e)  Pleading of the RICO Money Laundering Conspiracy Predicate

We agree with Plaintiffs that they have plausibly alleged a claim of conspiracy to commit money laundering.  But a single predicate act is not a pattern of predicate acts and therefore cannot support a RICO claim.  Thus, we agree with the District Court that Plaintiffs have failed to state a claim.

Plaintiffs allege that Wal-Mart paid its contractors with full knowledge that those contractors were hiring illegal immigrants to work in Wal-Mart's stores. Plaintiffs support this contention with further allegations that two senior Wal-Mart executives made comments that could be understood as acknowledging that the contractors had hired and would continue to hire illegal immigrants.  In fact, one of these executives encouraged one of the cleaning contractors to form multiple companies so that contracts and payments could be distributed over a greater number of recipients.  This suggestion was allegedly made shortly after a federal immigration sweep resulted in the detention of many of Wal-Mart's cleaners.

38

Money paid to the "shell" companies would facilitate the hiring of illegal workers. Because Wal-Mart is alleged to have known that many of those workers were illegal and that the companies would continue to hire illegal workers in the future, its intent to promote such activity can be inferred. Therefore, Plaintiffs have stated a claim for money laundering because Wal-Mart had the "intent . . . to promote the carrying on of specified unlawful activity" and "conduct[ed] or attempt[ed] to conduct a financial transaction involving . . . property used to conduct or facilitate specified unlawful activity[.]" 18 U.S.C. § 1956(a)(3). Unlike paragraph (a)(1) of the money laundering statute, paragraph (a)(3) does not require that the money used be the proceeds of illegal activity. Instead, the funds can be "property used to conduct or facilitate specified unlawful activity." 18 U.S.C. § 1956(a)(3). And these funds were allegedly used to conduct or facilitate the hiring of illegal immigrants.

But one predicate act does not constitute a RICO pattern. *See* 18 U.S.C. § 1961(5) ("[A] 'pattern of racketeering activity' requires at least two acts of racketeering activity[.]").[10] Therefore, we agree with the

---

[10] We note that Plaintiffs, for whatever reason, have only pled a *conspiracy* to commit money laundering, not money laundering itself. (A640) Even if we assume that acts of money laundering resulted from this conspiracy,

39

District Court that the Plaintiffs have failed to state a claim.

### f) Pleading of the RICO Immigration Conspiracy Predicates

We have concluded that Plaintiffs' allegations are insufficient to directly implicate Wal-Mart in the predicate acts of transporting, encouraging, or harboring. But Plaintiffs do allege facts that might support a conclusion that Wal-Mart's cleaning contractors engaged in these acts. Plaintiffs also allege that Wal-Mart conspired with those contractors. They support that claim with specific allegations that Wal-Mart executives acknowledged that contractors were hiring and would continue to hire illegal immigrants and that those contractors would continue to be hired by Wal-Mart. At most, though, the facts alleged by the Plaintiffs constitute a conspiracy with the object of saving money through illegal hiring. Even drawing all reasonable inferences in their favor, Plaintiffs have not alleged facts sufficient to support a conspiracy with the purpose of transporting or

---

Plaintiffs have not claimed those acts themselves as RICO predicates.

harboring illegal immigrants or encouraging illegal immigration.[11]

### C. *False Imprisonment*

Plaintiffs' false imprisonment claims survived Wal-Mart's initial motion to dismiss. Wal-Mart subsequently offered affidavits asserting that it locked its doors at night to provide security for its staff and merchandise, that managers were often available to open locked doors, and that Wal-Mart had accessible emergency exits, as required by state and federal law. Wal-Mart also argued that Plaintiffs' repeated return to stores where they were "imprisoned" constituted consent.

---

[11] Whether Plaintiffs' allegations in fact support claims of illegal hiring or conspiracy to commit illegal hiring is not before us, and is not an issue we purport to resolve. We note, though, that the intent element required for establishing an illegal hiring violation is difficult to meet, a difficulty recognized by our sister circuits. *See, e.g.*, *Walters v. McMahen*, __ F.3d ____, 2012 WL 2589229, at *4 (4th Cir. 2012). Given Plaintiffs' failure to plead a conspiracy to commit illegal hiring (and the insufficiency of Plaintiffs' allegations with respect to the conspiracies they did plead), we also have no occasion to consider whether predicate acts committed by co-conspirators in foreseeable furtherance of an alleged conspiracy predicate would themselves be RICO predicate acts. *Cf. Pinkerton v. United States*, 328 U.S. 640 (1946).

41

In response, Plaintiffs: (1) cited specific instances where they wanted to leave and managers were unavailable or refused to let them leave; (2) noted that no one ever showed them the location of emergency exits and their minimal proficiency in English would make it difficult or impossible to find them on their own; and (3) argued that Wal-Mart had an interest in concealing emergency exits to prevent theft of merchandise and discovery of the illegal workers by federal agents. On summary judgment, the District Court found Wal-Mart's assertions regarding the presence of emergency exits dispositive, as false imprisonment cannot occur where there is a safe alternative exit. *Zavala v. Wal-Mart Stores, Inc.*, No. 03-5309, 2011 WL 1337476 (D.N.J. Apr. 7, 2011). We agree with the District Court's conclusion, though we will expand on the District Court's analysis.

Federal Rule of Civil Procedure 56 requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a

42

verdict for the nonmoving party. *See id.* at 257. "We exercise plenary review over a District Court's grant of summary judgment and review the facts in the light most favorable to the party against whom summary judgment was entered." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 130 n.6 (3d Cir. 2001).

As this is a state law claim, the first question to be resolved is: what state law should be applied? After performing a choice-of-law analysis, the District Court applied New Jersey law. *Zavala*, 393 F. Supp. 2d at 333. We believe the District Court was correct in its choice of New Jersey law, and Plaintiffs do not dispute its application.

The majority of Plaintiffs' false imprisonment claims fail because Plaintiffs impliedly consented to their "imprisonment." Apparently from the very beginning of their employment, Plaintiffs were aware that Wal-Mart's policy was to close and lock the main doors of its stores when they are not open for business. Plaintiffs nevertheless chose to continue coming to work. They do not allege that they objected to the locked-door policy, nor do they allege that they requested a manager be available during their shift to open the doors. Continuing to come to work under these conditions is "conduct . . . reasonably understood by another to be intended as consent" and is therefore "as effective as consent in fact."

43

Restatement (Second) of Torts § 892.[12]    As such, Plaintiffs "cannot recover in an action of tort for the conduct or for harm resulting from it."  *Id.* at § 892A.

But consent can be withdrawn, and Plaintiffs allege two instances when they wanted to leave but were unable to do so.  Teresa Jaros alleges that she was sick and wanted to leave, but no manager was available to open the door.  Petr Zednik alleges that he had a toothache, asked to leave, and was told he could not.  He also alleges that he believed his manager, a "muscular" "blond" man, would assault him if he attempted to leave.

Jaros' consent likely encompasses the incident she alleges.  By the time of her illness, she knew that she must work in a locked store for the duration of the shift. She knew that a manager would often be absent and therefore unable to open the door should a problem arise. (PSA211)  Her consent arguably includes that aspect of her work.  Consent only terminates "when the actor

---

[12] The New Jersey courts make frequent use of the Restatement, including in resolving false imprisonment cases.  *See, e.g.*, *Freeman v. State*, 788 A.2d 867, 877 (N.J. Super. Ct. App. Div. 2002); *Fair Oaks Hosp. v. Pocrass*, 628 A.2d 829, 836 (N.J. Super. Ct. Law Div. 1993).  We have not seen any indication that the portions of the Restatement upon which we rely are contrary to New Jersey law.

knows or has reason to know that the other is no longer willing for him to continue the particular conduct." Restatement (Second) of Torts § 892A cmt. h. Since Wal-Mart was unaware that Jaros wanted to leave (because no manager was there), Jaros could not terminate her consent.

Regardless, Jaros' complaint and Zednik's complaint are resolved by the availability of emergency exits. "To make the actor liable for false imprisonment, the other's confinement within the boundaries fixed by the actor must be complete. . . . The confinement is complete although there is a reasonable means of escape, unless the other knows of it." Restatement (Second) of Torts § 36. While both Jaros and Zednik disclaim knowledge of the emergency exits, such knowledge is properly imputed to them, even over their proclaimed ignorance and even on summary judgment. Federal Rule of Evidence 201 permits judicial notice of facts "generally known within the trial court's territorial jurisdiction" and we have noted that this includes "matters of common knowledge." *See Gov't of Virgin Islands v. Gereau*, 523 F.2d 140, 147 (3d Cir. 1975). Courts have used judicial notice to establish facts in similar situations. *See Williams v. Kerr Glass Mfg. Corp.*, 630 F. Supp. 266, 270 (E.D.N.Y. 1986) (taking judicial notice of the distance between federal courts in New York and Pennsylvania and the numerous means of transportation between them); *Penthouse Int'l, Ltd. v.*

45

*Koch*, 599 F. Supp. 1338, 1346 (S.D.N.Y. 1984) (taking judicial notice of the "layout and physical characteristics" of the New York City subway system, which the judge rode daily to work).

Emergency exits are by regulation a common feature of commercial buildings in the United States. We agree with the District Court that "it appears . . . indisputable that these emergency exits are required by law to be clearly marked, easily accessible, and unobstructed." *Zavala*, No. 03-5309, 2011 WL 1337476, at *1 (internal quotation marks omitted). We conclude that Jaros and Zednik must have been aware of the existence of emergency exits as a general feature of buildings, and therefore they must have been aware that emergency exits were likely to exist in the stores in which they worked. A reasonable jury could not conclude otherwise.

The question remaining is whether emergency exits were in fact available and unobstructed at the Wal-Mart stores in question. Wal-Mart has offered evidence of the availability and unobstructed nature of emergency exits in its stores. Plaintiffs have not directly rebutted this evidence. They have merely offered speculation that Wal-Mart had motive to conceal any emergency exits. But Plaintiffs do not actually demonstrate that the exits were absent or obstructed in any way. Judgment in favor of Wal-Mart is appropriate.

46

Plaintiffs cannot succeed by advancing a defense that leaving through the emergency exit would trigger an alarm or potentially result in the loss of their jobs. Regarding the alarm, "it is unreasonable for one whom the actor intends to imprison to refuse to utilize a means of escape of which he is himself aware merely because it entails a slight inconvenience[.]" Restatement (Second) of Torts § 36 cmt. a; *Richardson v. Costco Wholesale Corp.*, 169 F. Supp. 2d 56, 61 (D. Conn. 2001) ("The fact that opening the employee exit door would result in an alarm sounding and possible employee discipline does not give rise to an inference that actual confinement or threatening conduct took place."). Nor is potential loss of employment a sufficient threat to constitute false imprisonment. *See Maietta v. United Parcel Serv., Inc.*, 749 F. Supp. 1344, 1367 (D.N.J. 1990) (concluding an employee's concern that he would lose his job if he exited an interview with company investigators was insufficient to support a claim for false imprisonment under New Jersey law), *aff'd* 932 F.2d 960 (3d Cir. 1991); *Richardson*, 169 F. Supp. 2d at 61-62 ("Moral pressure or threat of losing one's job does not constitute a threat of force sufficient to establish that plaintiffs were involuntarily restrained.").

The only remaining issue is Zednik's claim that when he approached his manager and was denied permission to leave, he "knew that [the manager] would assault [him] if [Zednik] tried to escape through any door

that would let [him] out." Zednik asserts that the manager wanted the store clean for the impending visit of a Wal-Mart executive. But Zednik's sole evidence of the manager's supposed violent tendencies is that the manager "is a muscular man (with blond hair)[.]" We need not credit this statement in any way.

In an earlier declaration, Zednik relates the toothache story and the request made to and denied by his manager, but curiously omits any belief that his manager would assault him. It is only in his third supplemental declaration – filed only a few weeks *after* Wal-Mart moved for summary judgment – that Zednik mentions the prospect that his manager might randomly assault him. Even on summary judgment, we need not credit a declaration contradicting a witness' prior sworn statements. *See Martin v. Merrell Dow Pharms., Inc.*, 851 F.2d 703, 705 (3d Cir. 1988); *see also Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251-54 (3d Cir. 2007) (discussing the sham affidavit doctrine). While not precisely contradictory, Zednik's omission of such a crucial fact is highly questionable.

But even absent these suspicious circumstances, we conclude that no reasonable jury could credit Zednik's speculative statement that his manager would assault him had he tried to leave. Zednik offers no evidence in support of the statement. He does not allege that the manager had a propensity for violence. And he

48

does not allege that the manager overtly or impliedly threatened him. Thus, summary judgment was appropriate.

## V. Conclusion

Over the course of eight years and a minimum of four opinions, the District Court rejected final certification of an FLSA class, rejected the RICO claim on several grounds, and rejected the false imprisonment claim on the merits. We will affirm.