**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-1583**

---

LAURA MCFEELEY, On Behalf of Herself and All Others Similarly situated, a/k/a Dynasty; DANIELLE EVERETT, a/k/a Jasmine; CRYSTAL NELSON; DANNIELLE ARLEAN MCKAY; JENNY GARCIA; PATRICE HOWELL,

        Plaintiffs – Appellees,

    and

EBONY WASHINGTON; FERRIS PACE; SHANIEKA DANIELS; SCHARLENE ALUGBUO; NICOLE PRECIOUS GRAY; TARSHEA JACKSON; CLEMENTINA IBE, as personal representative of the Estate of Scharlene Alugbuo,

        Plaintiffs,

    v.

JACKSON STREET ENTERTAINMENT, LLC, d/b/a Fuego Exotic Dance Club, d/b/a Club Extasy Exotic Dance Club; RISQUE, LLC, d/b/a Fuego Exotic Dance Club; QUANTUM ENTERTAINMENT GROUP, LLC, d/b/a Fuego Exotic Dance Club; NICO ENTEPRISES, INC., d/b/a Fuego Exotic Dance Club; XTC ENTERTAINMENT GROUP, LLC, d/b/a Fuego Exotic Dance Club; UWA OFFIAH,

        Defendants – Appellants.

-----------------------------------------

SECRETARY OF LABOR,

        Amicus Supporting Appellees.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge. (8:12-cv-01019-DKC)

---

Argued: May 11, 2016          Decided: June 8, 2016

---

Before WILKINSON, GREGORY, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Gregory and Judge Diaz joined.

---

**ARGUED:** Michael Lloyd Smith, SMITH GRAHAM & CRUMP, LLC, Largo, Maryland, for Appellants. Gregg Cohen Greenberg, ZIPIN, AMSTER & GREENBERG, LLC, Silver Spring, Maryland, for Appellees. Katelyn Jean Poe, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Michael K. Amster, ZIPIN, AMSTER & GREENBERG, LLC, Silver Spring, Maryland, for Appellees. M. Patricia Smith, Solicitor of Labor, Jennifer S. Brand, Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae.

---

WILKINSON, Circuit Judge:

In this case, exotic dancers have sued their dance clubs for failure to comply with the Fair Labor Standards Act and corresponding Maryland wage and hour laws. The district court held that plaintiffs were employees of the defendant companies and not independent contractors. The court properly captured the economic reality of the relationship here, and we now affirm its judgment.

## I.

Plaintiffs, as noted, are exotic dancers who worked at Fuego Exotic Dance Club (Fuego) and Extasy Exotic Dance Club (Extasy) in Prince George's County, Maryland for various periods between April 2009 and April 2012. Defendant Uwa Offiah owns and manages both Fuego and Extasy. No other party has a financial interest in them.

Plaintiffs alleged on behalf of themselves and others similarly situated that defendant clubs and Offiah had misclassified them as independent contractors rather than as club employees and accordingly had failed to pay them the minimum wage required by the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq., the Maryland Wage and Hour Law (MHWL), Md. Code Ann., Lab. & Empl. § 3-401, et seq. (West 2014), and the Maryland Wage Payment and Wage Collection Law (MWPWC), Md. Code Ann., Lab. & Empl. § 3-501, et seq. (West 2014). They sued

defendants both for unpaid wages and liquidated damages. The clubs denied that plaintiffs were employees at any point of their working relationship and raised counterclaims, all of which were unsuccessful, for breach of contract, unjust enrichment, conversion, and fraud.

We shall summarize at the outset the working relationship between the dancers and the clubs. Anyone wishing to dance at either club was required to fill out a form and perform an audition. Defendants asked all hired dancers to sign agreements titled "Space/Lease Rental Agreement of Business Space" that explicitly categorized dancers as independent contractors. The clubs began using these agreements after being sued in 2011 by dancers who claimed, as plaintiffs do here, to have been employees rather than independent contractors. Defendant Offiah thereafter consulted an attorney, who drafted the agreement containing the "independent contractor" language.

Plaintiffs' duties at Fuego and Extasy primarily involved dancing on stage and in certain other areas of the two clubs. At no point did the clubs pay the dancers an hourly wage or any other form of compensation. Rather, plaintiffs' compensation was limited to performance fees and tips received directly from patrons. The clubs also collected a "tip-in" fee from everyone who entered either dance club, patrons and dancers alike. The

4

dancers and clubs dispute other aspects of their working relationship, including work schedules and policies.

On January 3, 2014, plaintiffs filed a motion for partial summary judgment, and defendants countered with a cross-motion for summary judgment. The district court granted plaintiffs' motion in part, finding that plaintiffs were employees and not independent contractors under both federal and state law. In drawing that conclusion, the district court applied the six-factor "economic realities" test for classifying employees and independent contractors. The court placed special emphasis on "the degree of control that the putative employer has over the manner in which the work is performed," Schultz v. Capital Int'l Sec., Inc., 466 F.3d 298, 304-05 (4th Cir. 2006), observing that defendants "exercised significant control over the atmosphere, clientele, and operations of the clubs." J.A. 996-97.

The court reserved various disputes over monetary recovery for the jury. Prior to trial, plaintiffs filed a motion in limine seeking to prohibit defendants from asking plaintiffs about their income tax records, performance fees, and tips. After conducting a hearing, the court granted the motion.

The case was tried before a jury from February 3 to 5, 2015. The trial court rejected the clubs' objections to the jury instructions and the verdict sheet. The jury found in favor of plaintiffs and awarded them damages for unpaid wages.

Separately, the district court heard testimony on the issue of liquidated damages and defendants' proffered good-faith defense. The court found that defendants had consulted an attorney in September 2011 regarding classifying dancers as independent contractors and thereafter reasonably believed that they were not violating the FLSA. The court awarded liquidated damages to each of the plaintiffs only for the period prior to September 2011. Defendants filed a motion for judgment as a matter of law and/or for a new trial. Both motions were denied on May 5, 2015. This appeal followed.

## II.

Appellants seek review as to five questions: (1) whether plaintiffs were employees or independent contractors under the FLSA and related state laws; (2) whether defendants acted in good faith prior to September 2011 and were therefore not liable to pay liquidated damages for that time period; (3) whether the district court erred in barring defendants from presenting evidence related to plaintiffs' income taxes, performance fees, and tips; (4) whether the district court erred in formulating its jury instructions and verdict sheet; and (5) whether the trial court erred in denying defendants' motion for judgment as a matter of law and/or for a new trial. We shall address these issues seriatim.

6

Whether a worker is an employee or an independent contractor under the FLSA is ultimately a legal question subject to de novo review. Schultz, 466 F.3d at 304. We agree with the district court that, based on the totality of the circumstances presented here, the dancers at Fuego and Extasy were employees covered by the FLSA and analogous state laws. They were not independent contractors. Because plaintiffs' claims under Maryland labor laws run parallel to their claims under the FLSA, our analysis of federal law extends as well to the state law claims.

Congress enacted the FLSA to protect "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." Benshoff v. City of Va. Beach, 180 F.3d 136, 140 (4th Cir. 1999) (quoting Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597 (1944)). In keeping with those "remedial and humanitarian" goals, id. (quoting Tenn. Coal, Iron & R.R. Co., 321 U.S. at 597), Congress applied the FLSA broadly, as reflected in the Act's definitions of "employee" ("any individual employed by an employer"), "employer" ("any person acting directly or indirectly in the interest of an employer in relation to an employee"), and "employ" ("to suffer or permit to work"). 29 U.S.C. §§ 203(d), (e)(1), & (g). The statute mandates a minimum

7

wage and overtime pay for all covered employees. Id. §§ 206 & 207.

To determine whether a worker is an employee under the FLSA, courts look to the "'economic realities' of the relationship between the worker and the putative employer." Schultz, 466 F.3d at 304. The touchstone of the "economic realities" test is whether the worker is "economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself." Id. Application of the test turns on six factors:

(1)  [T]he degree of control that the putative employer has over the manner in which the work is performed;
(2)  the worker's opportunities for profit or loss dependent on his managerial skill;
(3)  the worker's investment in equipment or material, or his employment of other workers;
(4)  the degree of skill required for the work;
(5)  the permanence of the working relationship; and
(6)  the degree to which the services rendered are an integral part of the putative employer's business.

Id. at 304-05. "No single factor is dispositive," id. at 305 -- all six are part of the totality of circumstances presented. See Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998). While a six-factor test may lack the virtue of providing definitive guidance to those affected, it allows for flexible application to the myriad different working relationships that exist in the national economy. In other words, the court must adapt its analysis to the particular

8

working relationship, the particular workplace, and the particular industry in each FLSA case.

B.

Here, as in so many FLSA disputes, plaintiffs and defendants offer competing narratives of their working relationship. The exotic dancers claim that all aspects of their work at Fuego and Extasy were closely regulated by defendants, from their hours to their earnings to their workplace conduct. The clubs, not surprisingly, portray the dancers as free agents that came and went as they pleased and used the clubs as nothing but a rented space in which to perform. The dueling depictions serve to remind us that the employee/independent contractor distinction is not a bright line but a spectrum, and that courts must struggle with matters of degree rather than issue categorical pronouncements.

Based on the totality of the circumstances presented here, the relationship between plaintiffs and defendants falls on the employee side of the spectrum. Even given that we must view the facts in the light most favorable to defendants, see Ctr. for Individual Freedom, Inc. v. Tennant, 706 F.3d 270, 279 (4th Cir. 2013), we cannot accept defendants' contrary characterization, which cherry-picks a few facts that supposedly tilt in their favor and downplays the weightier and more numerous factors indicative of an employment relationship. Most critical on the

9

facts of this case is the first factor of the "economic realities" test: the degree of control that the putative employer has over the manner in which the work is performed.

The clubs insist they had very little control over the dancers. Plaintiffs were allegedly free in the clubs' view to determine their own work schedules, how and when they performed, and whether they danced at clubs other than Fuego and Extasy. But the relaxed working relationship represented by defendants -- the kind that perhaps every worker dreams about -- finds little support in the record. To the contrary, plaintiffs described and the district court found the following plain manifestations of defendants' control over the dancers:

- Dancers were required to sign in upon arriving at the club and to pay the "tip-in" or entrance fee required of both dancers and patrons.

- The clubs dictated each dancer's work schedule. As plaintiff Danielle Everett testified, "I ended up having a set schedule once I started at Fuego's. Tuesdays and Thursdays there, and Mondays, Wednesdays, Fridays, and Saturdays at Extasy." J.A. 578 (Everett's deposition). This was typical of the deposition testimony submitted in the summary judgment record.

- The clubs imposed written guidelines that all dancers had to obey during working hours. J.A. 769-77 (clubs'

10

rulebook). These rules went into considerable detail, banning drinking while working, smoking in the clubs' bathroom, and loitering in the parking lot after business hours. They prohibited dancers from leaving the club and returning later in the night. Dancers were required to wear dance shoes at all times and could not bring family or friends to the clubs during working hours. Violations of the clubs' guidelines carried penalties such as suspension or dismissal. Although the defendants claimed not to enforce the rules, as the district court put it, "[a]n employer's 'potential power' to enforce its rules and manage dancers' conduct is a form of control." J.A. 997 (quoting Hart v. Rick's Cabaret Int'l, Inc., 967 F.Supp.2d 901, 918 (S.D.N.Y. 2013)).

- The clubs set the fees that dancers were supposed to charge patrons for private dances and dictated how tips and fees were handled. The guidelines explicitly state: "[D]o not [overcharge] our customers. If you do, you will be kicked out of the club." J.A. 771.

- Defendants personally instructed dancers on their behavior and conduct at work. For example, one manager stated that he "'coached' dancers whom he believed did not have the right attitude or were not behaving properly." J.A. 997.

11

- Defendants managed the clubs' atmosphere and clientele by making all decisions regarding advertising, hours of operation, and the types of food and beverages sold, as well as handling lighting and music for the dancers. Id.

Taking the above circumstances into account, the district court found that the clubs' "significant control" over how plaintiffs performed their work bore little resemblance to the latitude normally afforded to independent contractors. J.A. 997. We agree. The many ways in which defendants directed the dancers rose to the level of control that an employer would typically exercise over an employee. To conclude otherwise would unduly downgrade the factor of employer control and exclude workers that the FLSA was designed to embrace.

None of this is to suggest that a worker automatically becomes an employee covered by the FLSA the moment a company exercises any control over him. After all, a company that engages an independent contractor seeks to exert some control, whether expressed orally or in writing, over the performance of the contractor's duties and over his conduct on the company's premises. It is rather hard to imagine a party contracting for needed services with an insouciant "Do whatever you want, wherever you want, and however you please." A company that leases space or otherwise invites independent contractors onto its property might at a minimum wish to prohibit smoking and

12

littering or to set the hours of use in order to keep the premises in good shape. Such conditions, along with the terms of performance and compensation, are part and parcel of bargaining between parties whose independent contractual status is not in dispute.

If any sign of control or any restriction on use of space could convert an independent contractor into an employee, there would soon be nothing left of the former category. Workers and managers alike might sorely miss the flexibility and freedom that independent-contractor status confers. But the degree of control the clubs exercised here over all aspects of the individual dancers' work and of the clubs' operation argues in favor of an employment relationship. Each of the other five factors of the "economic realities" test is either neutral or leads us in the same direction.

Two of those factors relate logically to one other: "the worker's opportunities for profit or loss dependent on his managerial skill" and "the worker's investment in equipment or material, or his employment of other workers." Schultz, 466 F.3d at 305. The relevance of these two factors is intuitive. The more the worker's earnings depend on his own managerial capacity rather than the company's, and the more he is personally invested in the capital and labor of the enterprise, the less the worker is "economically dependent on the business" and the

more he is "in business for himself" and hence an independent contractor. Id. at 304 (quoting Henderson v. Inter-Chem Coal Co., Inc., 41 F.3d 567, 570 (10th Cir. 1994)).

The clubs attempt to capitalize on these two factors by highlighting that dancers relied on their own skill and ability to attract clients. They further contend that dancers sold tickets for entrance to the two clubs, distributed promotional flyers, and put their own photos on the flyers. As the district court noted, however, "[t]his argument -- that dancers can 'hustle' to increase their profits -- has been almost universally rejected." J.A. 999 (collecting cases). It is natural for an employee to do his part in drumming up business for his employer, especially if the employee's earnings depend on it. An obvious example might be a salesperson in a retail store who works hard at drawing foot traffic into the store. The skill that the employee exercises in that context is not managerial but simply good salesmanship.

Here, the lion's share of the managerial skill and investment normally expected of employers came from the defendants. The district court found that the clubs' managers "controlled the stream of clientele that appeared at the clubs by setting the clubs' hours, coordinating and paying for all advertising, and managing the atmosphere within the clubs." J.A. 1001. They "ultimately controlled a key determinant -- pricing -

14

– affecting [p]laintiffs' ability to make a profit." Id. In terms of investment, defendants paid "rent for both clubs; the clubs' bills such as water and electric; business liability insurance; and for radio and print advertising," as well as wages for all non-performing staff. Id. at 1002. The dancers' investment was limited to their own apparel and, on occasion, food and decorations they brought to the clubs. Id. at 1002-03.

On balance then, plaintiffs' opportunities for profit or loss depended far more on defendants' management and decision-making than on their own, and defendants' investment in the clubs' operation far exceeded the plaintiffs'. These two factors thus fail to tip the scales in favor of classifying the dancers as independent contractors.

As with the control factor, however, neither of these two elements should be overstated. Those who engage independent contractors are often themselves companies or small businesses with employees of their own. Therefore, they have most likely invested in the labor and capital necessary to operate the business, taken on overhead costs, and exercised their managerial skill in ways that affect the opportunities for profit of their workers. Those fundamental components of running a company, however, hardly render anyone with whom the company transacts business an "employee" under the FLSA. The focus, as suggested by the wording of these two factors, should remain on

15

the worker's contribution to managerial decision-making and investment relative to the company's. In this case, the ratio of managerial skill and operational support tilts too heavily towards the clubs to support an independent-contractor classification for the dancers.

The final three factors are more peripheral to the dispute here and will be discussed only briefly: the degree of skill required for the work; the permanence of the working relationship; and the degree to which the services rendered are an integral part of the putative employer's business. As to the degree of skill required, the clubs conceded that they did not require dancers to have prior dancing experience. The district court properly found that "the minimal degree of skill required for exotic dancing at these clubs" supported an employee classification. J.A. 1003-04. Moreover, even the skill displayed by the most accomplished dancers in a ballet company would hardly by itself be sufficient to denote an independent contractor designation.

As to the permanence of the working relationship, courts have generally accorded this factor little weight in challenges brought by exotic dancers given the inherently "itinerant" nature of their work. J.A. 1004-05; see also Harrell v. Diamond A Entm't, Inc., 992 F.Supp. 1343, 1352 (M.D. Fla. 1997). In this case, defendants and plaintiffs had "an at-will arrangement that

16

could be terminated by either party at any time." J.A. 1005. Because this type of agreement could characterize either an employee or an independent contractor depending on the other circumstances of the working relationship, we agree with the district court that this temporal element does not affect the outcome here.

Finally, as to the importance of the services rendered to the company's business, even the clubs had to concede the point that an "exotic dance club could [not] function, much less be profitable, without exotic dancers." Secretary of Labor's Amicus Br. in Supp. of Appellees 24. Indeed, "the exotic dancers were the only source of entertainment for customers . . . . especially considering that neither club served alcohol or food." J.A. 1006. Considering all six factors together, particularly the defendants' high degree of control over the dancers, the totality of circumstances speak clearly to an employer-employee relationship between plaintiffs and defendants. The trial court was right to term it such.

III.

A.

Based on their view that they were employees and not independent contractors, the dancers sued defendants for unpaid wages and liquidated damages. The clubs tried to avoid liability in two ways. First, they raised a good faith defense to shield

17

themselves from liquidated damages. Second, they characterized performance fees and tips that patrons paid to dancers as offsets to any compensation the clubs were obligated to pay. Other than the good faith and offset defenses, the amount of monetary relief awarded to each plaintiff is not in dispute.

We review the district court's award of liquidated damages for abuse of discretion. Perez v. Mountaire Farms, Inc., 650 F.3d 350, 375 (4th Cir. 2011). The FLSA allows covered employees to sue for "their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). This provision for liquidated damages is an additional penalty on non-compliant employers. If an employer were instead liable for only unpaid wages and overtime pay, it might roll the dice by underpaying employees, reasoning all the while it would be no worse off even if the employees eventually prevailed in court.

As a potential defense to liquidated damages, however, employers may seek to show that they acted in "good faith" and "had reasonable grounds for believing that [their] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. Here, the district court held that defendants had a valid good faith defense after September 2011 but not prior to that date. In September 2011, Offiah, the owner of Fuego and Extasy, consulted an attorney in response to a lawsuit by dancers

18

claiming to be employees rather than independent contractors. The attorney advised Offiah to require all dancers to sign agreements designating themselves independent contractors and acknowledging the reasons therefor. The district court found Offiah's reliance on the attorney's advice from that point onward to constitute good faith and reasonable belief of compliance with the FLSA.

Defendants now claim the good faith defense for the period prior to September 2011. When defendant Offiah took over management of the Fuego and Extasy dance clubs in 2007 and 2009, respectively, he changed nothing about the way they had been operated. Since the dancers had always been classified as independent contractors, Offiah assumed that classification was appropriate. He made no effort to look into the law or seek legal advice until he faced a lawsuit in September 2011. If mere assumption amounted to good faith and reasonable belief of compliance, no employer would have any incentive to educate itself and proactively conform to governing labor law. The district court did not err in rejecting defendants' good faith defense for the period prior to September 2011 and awarding plaintiffs liquidated damages for that period.

B.

Appellants' second attack on their liability for damages targets the district court's alleged error in excluding from

19

trial evidence regarding plaintiffs' income tax returns, performance fees, and tips. The clubs contend that fees and tips kept by the dancers would have reduced any compensation that defendants owed plaintiffs under the FLSA and MWHL. According to defendants, the fees and tips dancers received directly from patrons exceeded the minimum wage mandated by federal and state law. Had the evidence been admitted, the argument goes, the jury may have awarded plaintiffs less in unpaid wages.

We disagree. The district court found that evidence related to plaintiffs' earnings was irrelevant or, if relevant, posed a danger of confusing the issues and misleading the jury. See Fed. R. Evid. 403. Proof of tips and fees received was irrelevant here because the FLSA precludes defendants from using tips or fees to offset the minimum wage they were required to pay plaintiffs. To be eligible for the "tip credit" under the FLSA and corresponding Maryland law, defendants were required to pay dancers the minimum wage set for those receiving tip income and to notify employees of the "tip credit" provision. 29 U.S.C. 203(m); Md. Code Ann., Lab. & Empl. § 3-419 (West 2014). The clubs paid the dancers no compensation of any kind and afforded them no notice. They cannot therefore claim the "tip credit."

The clubs are likewise ineligible to use performance fees paid by patrons to the dancers to reduce their liability. Appellants appear to distinguish performance fees from tips in

20

their argument, without providing much analysis in their briefs on a question that has occupied other courts. See, e.g., Hart, 967 F.Supp.2d at 926-34 (discussing how performance fees received by exotic dancers relate to minimum wage obligations). If performance fees do constitute tips, defendants would certainly be entitled to no offset because, as noted above, they cannot claim any "tip credit." For the sake of argument, however, we treat performance fees as a possible separate offset within the FLSA's "service charge" category. Even with this benefit of the doubt, defendants come up short.

For purposes of the FLSA, a "service charge" is a "compulsory charge for service . . . imposed on a customer by an employer's establishment." 29 C.F.R. § 531.55(a). There are at least two prerequisites to counting "service charges" as an offset to an employer's minimum-wage liability. The service charge "must have been included in the establishment's gross receipts," Hart, 967 F.Supp.2d at 929, and it must have been "distributed by the employer to its employees," 29 C.F.R. § 531.55(b). These requirements are necessary to ensure that employees actually received the service charges as part of their compensation as opposed to relying on the employer's assertion or say-so. See Hart, 967 F.Supp.2d at 930. We do not minimize the recordkeeping burdens of the FLSA, especially on small

businesses, but some such obligations have been regarded as necessary to ensure compliance with the statute.

Neither condition for applying the service-charge offset is met here. As conceded by defendant Offiah, the dance clubs never recorded or included as part of the dance clubs' gross receipts any payments that patrons paid directly to dancers. J.A. 491-97 (Offiah's deposition). When asked about performance fees during his deposition, defendant Offiah repeatedly stressed that fees belong solely to the dancers. Id. Since none of those payments ever went to the clubs' proprietors, defendants also could not have distributed any part of those service charges to the dancers. As a result, the "service charge" offset is unavailable to defendants. Accordingly, the trial court correctly excluded evidence showing plaintiffs' earnings in the form of tips and performance fees.

C.

The clubs object next to the jury instructions and verdict sheet used during trial. They argue that the trial court should have instructed the jury on the purpose of the FLSA as they requested and should have given the jury a more detailed verdict form. In denying both requests, the district court acted well within its discretion. The jury instructions given included the relevant components of the FLSA and corresponding Maryland laws. The verdict form used informed the jury of how to calculate the

22

unpaid wage damages owed to plaintiffs. A general statement of the FLSA's purpose or more detail in the verdict form would not have aided the jury in reaching a sounder outcome.

Finally, the clubs fault the district court for failing to grant their motion for judgment as a matter of law and/or for a new trial. A new trial is appropriate if the verdict is "against the clear weight of the evidence" or "is based on evidence which is false" or "will result in a miscarriage of justice." Buckley v. Mukasey, 538 F.3d 306, 317 (4th Cir. 2008). Here, the sole basis for appellants' demand for a new trial is the district court's alleged skepticism about certain plaintiffs' testimony regarding dates and hours worked. Mere challenges to witness credibility on appeal, however, fall well short of the standard for granting a new trial. Moreover, the district court found that "[n]either party has provided financial records," and so the best evidence available came from plaintiffs' own recollection, which the jury duly considered along with defendants' objections to its accuracy. J.A. 1018-19. It would impede the goals of the FLSA to penalize employees for their employers' inadequate recordkeeping. In short, we find no grounds for reversal in the clubs' quibbles with the jury instructions, the verdict sheet, or the denial of its new trial motion.

IV.

We must be mindful in the end that we are applying a statute which Congress thought was necessary to provide "fair labor standards" for employees, including those marginalized workers unable to exert sufficient leverage or bargaining power to achieve adequate wages in the absence of statutory protections. To rule for the clubs under the circumstances here would run too great a risk of undercutting the Act's basic aim. Accordingly, and for the reasons given above, the judgment of the district court is

AFFIRMED.