PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 18-2462

———————————

PRIYA VERMA, On behalf of herself and
All others similarly situated

v.

3001 CASTOR, INC., d/b/a The Penthouse Club and/or
The Penthouse Club@Philly; ABCDE PENNSYLVANIA
MANAGEMENT, LLC;
DOE DEFENDANTS 1-10

3001 Castor, Inc.,
                                            Appellant

———————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-13-cv-03034)
District Judge: Honorable Anita B. Brody

———————————

Argued April 17, 2019

Before: AMBRO, GREENAWAY, JR.,
and SCIRICA, Circuit Judges

(Opinion filed: August 30, 2019)

John F. Innelli (Argued)
Two Penn Center, Suite 1300
Philadelphia, PA  19102

      Counsel for Appellant

Jamisen A. Etzel (Argued)
Gary F. Lynch
Carlson Lynch Kilpela & Carpenter
1133 Penn Avenue, 5th Floor
Pittsburgh, PA  15222

Gerald D. Wells, III
Connolly Wells & Gray
2200 Renaissance Boulevard, Suite 275
King of Prussia, PA  19406

      Counsel for Appellee

———————

OPINION OF THE COURT

———————

AMBRO, Circuit Judge

A jury in the District Court awarded more than $4.5 million to a class of dancers at the Penthouse Club, an "adult gentleman's club" in Philadelphia owned and operated by 3001 Castor, Inc., for unpaid minimum wages and unjust

enrichment under Pennsylvania law. The Court denied the motion of Castor to set aside the verdict, and it appeals to us. We join our District Court colleague, Judge Brody, in concluding that, as a matter of "economic reality," the dancers were employees of Castor, not its independent contractors, and we reject Castor's novel argument that the federal Fair Labor Standards Act ("FLSA") precludes the class's claims for unjust enrichment. We also conclude that Castor is not entitled to any credit or offset against the jury award for payments already received by the dancers. We thus affirm across the board and sustain the jury's verdict.

## I.     Background

Priya Verma was a dancer at the Penthouse Club, a nightclub in Philadelphia operated by Castor. As Judge Brody explained, the Club provides "topless female dancers" who "entertain [Castor's] customers by performing seductive dances." *Verma v. 3001 Castor, Inc.*, 2014 WL 2957453, at *1 (E.D. Pa. June 30, 2014). As the Club's owner and operator, Castor controlled its atmosphere, policies, operations, and marketing.

Dancers at the Club were classified into two categories: "Entertainers" and "Freelancers." It required Entertainers to commit to working at least four days per week and submit a weekly schedule. Freelancers had no such commitments. Castor required each dancer in both categories to sign an agreement stating that she is an independent contractor.

Dancers at the Club worked in shifts. They could choose among five: a "day shift" lasting from noon to 6:00 p.m.; a "mid shift" from 3:00 p.m. to 9:00 p.m.; a "preferred shift" from 6:00 p.m. to midnight; a "premium shift" from 8:00 p.m. to 2:00 a.m.; and a "power shift" from 10:00 p.m. to 2:00

3

a.m. A dancer had to "rent" stage time for each shift she worked. The rates for these "stage-rental fees" varied depending on the shift and were lower for Entertainers than for Freelancers. Dancers performed in two locations: on the Club's main stage and in private dance rooms.

The Club did not pay dancers a wage; their compensation consisted entirely of (1) "tips" they received when dancing on stage or (2) fixed "dance fees" at rates established by the Club, which they received from giving "private dances" in the private dance rooms. The Club also took a fee, called a "room-rental fee," for each private dance. Castor also required the dancers to "tip out" certain individuals who worked at the Club. These "mandatory tip-outs" had to be paid for each shift regardless how much money the dancer made in the shift. They included $15 to the Club's disc jockey, $10 to the "house mom" (who kept track of the dancers' schedules and assisted them in other ways), and $5 to the podium host, for a total of $30 per shift.

The Club provided training to the dancers and closely reviewed their attendance, appearance, demeanor, and customer service. It also had a strict set of rules the dancers must follow. When they violated those rules, they were fined amounts ranging from $10 to $100.

In 2013 Verma filed this action against Castor on behalf of herself and similarly situated current and former dancers at the Club. She alleged claims for minimum wages and overtime under the FLSA, 29 U.S.C. §§ 206(a), 207(a), 216(b), analogous claims for minimum wages and overtime under the Pennsylvania Minimum Wage Act ("PMWA"), 43 Pa. Stat. §§ 333.104 & .113, a claim for non-payment of wages under the Pennsylvania Wage Payment and Collection Law, 43 Pa. Stat. § 260.9a, and a claim for unjust enrichment under Pennsylvania common law.

4

On the FLSA claims, Verma alleged an "opt-in" collective action under 29 U.S.C. § 216(b). *See Knepper v. Rite Aid Corp.*, 675 F.3d 249, 258–59 (3d Cir. 2012).[1] On the state-law claims, she pursued a damages class action under Federal Rule of Civil Procedure 23(b)(3).[2] The case proceeded

---

[1] 29 U.S.C. § 216(b) provides that private claims under the FLSA may be pursued collectively "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." Unlike class actions under the Federal Rules of Civil Procedure, FLSA collective actions under § 216(b) are "opt in" actions—that is, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). The procedures for these collective actions, which are not disputed here, have been described in prior cases. *See, e.g.*, *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 534 (3d Cir. 2012).

[2] Rule 23(b)(3) provides that a class action may be maintained if the requirements of Rule 23(a) are met and "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The requirements of Rule 23(a) are having (1) so many class members that joinder is impractical, (2) questions of law or fact that are common to the class, (3) one or more representatives whose claims or defenses are typical of those in the class, and (4) representatives who will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a)(1)–(4).

along two tracks: one under the collective-action provisions of the FLSA, and another under the class-action procedures of Rule 23. We and other circuits have endorsed this dual-track procedure, which is used widely to pursue wage-and-hour cases in federal court simultaneously under federal and state law. *See Knepper*, 675 F.3d at 262 (collecting cases).

After some discovery, the District Court entered an order conditionally certifying a collective action under the FLSA comprising current and former dancers of the Club during the covered time period. *3001 Castor*, 2014 WL 2957453, at \*13. A notice was sent to potential members of the collective action, and 22 dancers filed consent forms to join the action as "opt-in" plaintiffs. (For convenience, Verma and the opt-in plaintiffs are described as "plaintiffs.") The District Court also ruled, as a matter of law, that plaintiffs and the other dancers were "employees" of Castor under the FLSA and the PMWA. *Id.* at \*4–10.

After further discovery, the Court entered an order granting final certification of the FLSA collective action (covering both the minimum-wage and overtime claims) and granting in part Verma's motion for class certification under Rule 23. *See Verma v. 3001 Castor*, 2016 WL 6962522, at \*6, \*14 (E.D. Pa. Nov. 29, 2016). The Court certified a Rule 23(b)(3) class with respect to the following claims under Pennsylvania law: (i) a claim for minimum wages under the PMWA, (ii) a claim for overtime under the PMWA, and (iii) a claim for unjust enrichment based on deductions for mandatory tip-outs. (It denied class certification to the extent plaintiffs sought to recover deductions for stage-rental fees, fines, and room-rental fees. *Id.* at \*10–11.)

A couple weeks before trial, plaintiffs and Castor purportedly reached an agreement in principle to settle an aspect of plaintiffs' FLSA claims. The terms of that alleged settlement

are not in the record, and there appears to be disagreement between counsel concerning what those terms are and whether an agreement was actually reached. What we know is this: plaintiffs were to receive $109,000 in exchange for not presenting at trial some portion of their FLSA claims.

Shortly after the alleged settlement, Castor filed a motion to dismiss the action for lack of subject matter jurisdiction. It argued that a settlement concerning the FLSA claims—the only federal claims involved—deprived the District Court of jurisdiction over the case. The Court denied that motion because, in its view, it retained supplemental jurisdiction over the state claims under 28 U.S.C. § 1367(a).

The remaining claims—class claims for minimum wages under the PMWA, overtime under the PMWA, and unjust enrichment—went to trial. The jury returned a verdict awarding the class more than $4.5 million: $2,610,322.61 for its minimum wage claims and $1,948,400.12 for its unjust enrichment claims. Castor filed post-trial motions asking the Court to dismiss the suit for lack of jurisdiction, to reconsider its summary-judgment rulings, and to enter judgment for Castor as a matter of law. The Court denied those motions and entered final judgment on the verdict. Castor appeals to us.

## II. Discussion

We have jurisdiction to review the final judgment of the District Court under 28 U.S.C. § 1291. *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002). Castor challenges on several grounds the District Court's judgment entering the $4.5 million jury verdict. We address each in turn.

7

## A. The District Court's Jurisdiction

Castor contends the District Court did not have jurisdiction to try this case. It claims the Court should have granted its motion to dismiss for lack of jurisdiction after the parties reached an agreement in principle to settle an aspect of plaintiffs' FLSA claims. According to Castor, once those claims were excised from the case, the Court should not have exercised supplemental jurisdiction under § 1367(a). Instead, it should have dismissed plaintiffs' state-law claims because (i) they presented "novel or complex issue[s] of State law," 28 U.S.C. § 1367(c)(1), (ii) they "substantially predominate[d]" over the federal claims, *id.* § 1367(c)(2), and (iii) it was improper to try the state-law claims on their own.

We need not review the decision to exercise supplemental jurisdiction in these circumstances. Irrespective whether the District Court had that jurisdiction, it no doubt had jurisdiction over plaintiffs' state-law claims under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109–2, 119 Stat. 4 (codified in scattered sections of Title 28 of the U.S. Code). That statute gives district courts original jurisdiction over class actions that (i) involve more than 100 class members, (ii) have an aggregate amount in controversy greater than $5 million, and (iii) have diversity of citizenship between any class member and any defendant. 28 U.S.C. § 1332(d). Those criteria clearly were met here: the complaint alleged a class of more than 300 dancers, an aggregate amount in controversy more than $5 million, and the requisite diversity of citizenship.

Castor contends that CAFA's amount-in-controversy requirement was not satisfied because the maximum damages the dancers could recover was only around $700,000. We disagree for two reasons. First, because Castor did not raise a factual challenge to the complaint's CAFA allegations until the

8

eve of trial, the jurisdictional allegations in the complaint are controlling. *See Neale v. Volvo Cars of N.A., LLC*, 794 F.3d 353, 357 n.1 (2015) (where no factual challenge is raised to CAFA allegations, they are controlling unless "it is clear to a legal certainty that the plaintiff cannot recover the amount claimed"); *see also Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553 (2014) ("When a plaintiff invokes federal-court jurisdiction, the plaintiff's amount-in-controversy allegation is accepted if made in good faith."); *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 395–96 (3d Cir. 2016) ("[U]nder a long-standing rule, federal diversity jurisdiction is generally determined based on the circumstances prevailing at the time the suit was filed." (quotation and brackets omitted)).

Second, even if we were to consider Castor's belated factual challenge to the District Court's jurisdiction under CAFA, we would easily conclude from the record—including the approximately $4.5 million jury verdict—that the amount in controversy exceeded $5 million all along. The verdict does not include attorneys' fees, which do count for CAFA's amount-in-controversy threshold, *see Neale*, 794 F.3d at 357 n.1, and was entered based on a narrower scope of issues (and thus a smaller amount in controversy) than were initially pled in the complaint, *see* Verma Br. at 17–18 (summarizing the additional categories of alleged damages the District Court excluded from class certification). As we recently explained, a putative class action's qualification for CAFA jurisdiction is determined based on the class action that is "filed" under Rule 23—in other words, the class action that is alleged. *Coba v. Ford Motor Co.*, --- F.3d ---, 2019 WL 3367573, at *3 (3d Cir. July 26, 2019). We thus conclude that CAFA's amount-in-controversy requirement was met here in any event. In short, the District Court had jurisdiction under CAFA to determine the class's state-law claims.

We also believe the Court acted within its discretion to exercise jurisdiction over those claims under § 1367(a). Before the FLSA claims were dropped, the overlap between the federal and state-law claims was substantial. Allowing Verma to pursue them through the customary "dual-track" procedure we endorsed in *Knepper* was reasonable. 675 F.3d at 262. And although the federal claims were not presented at trial, the Court may have reasonably concluded that "considerations of judicial economy, convenience, and fairness to the parties provide[d] an affirmative justification for" exercising jurisdiction. *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quotation omitted).

## B. The District Court's Pre-trial "Employee" Ruling

As noted, before trial the District Court ruled as a matter of law that plaintiffs and the other dancers were "employees" of Castor under the FLSA and the PMWA. Castor claims that ruling erred and asks us to reverse it. But before reaching this issue, we address a threshold argument made by the class.

### 1. Appellate Jurisdiction

Verma contends we lack jurisdiction to review the District Court's classification of the dancers as employees. She claims that ruling is unreviewable either because (a) it was part of an unappealable order denying a motion for summary judgment, or (b) Castor forfeited any challenge to that ruling by not objecting at trial when the Court instructed the jury that "[the Court] ha[s] already determined that Verma and the other Dancers were employees, not independent contractors." Verma Br. at 24–25.

Both contentions miss the mark. Regardless how it was labeled, the Court's ruling that Verma and the other dancers by

10

law are employees was in substance a partial grant of summary judgment in favor of plaintiffs on each of their claims that was premised on the existence of that employer–employee relationship. As such, we can review it under the "merger rule," which provides that interlocutory orders, such as partial grants of summary judgment, "merge with the final judgment in a case, and the interlocutory orders (to the extent that they affect the final judgment) may be reviewed on appeal from the final order." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 706 (3d Cir. 1996)); *see also Roberts v. Ferman*, 826 F.3d 117, 121 n.3 (3d Cir. 2016) ("[B]ecause interlocutory orders such as partial grants of summary judgment merge with the final judgment, they can be challenged on appeal.").

As an aside, we note that Castor did not explicitly identify the District Court's partial grant of summary judgment in its notice of appeal; instead it identified the Court's order denying the motion to reconsider its grant of partial summary judgment. But that does not bar our review. We exercise appellate jurisdiction over orders "that are not specified in the notice of appeal where: (1) there is a connection between the specified and unspecified orders; (2) the intention to appeal the unspecified order is apparent; and (3) the opposing party is not prejudiced and has a full opportunity to brief the issues." *Trzaska v. L'Oreal USA, Inc.*, 865 F.3d 155, 163 (3d Cir. 2017) (quotation omitted). These requirements are all met here: the specified and unspecified orders were both related to Castor's opposition to summary judgment on the employee/independent-contractor issue, Castor's intention to appeal that issue is evident from the 15 pages it devoted to the issue in its opening brief, and plaintiffs took their full opportunity to brief it on appeal.

11

## 2. Merits

That brings us to the merits of the District Court's "employee" ruling. Whether a worker is an employee or an independent contractor under the FLSA or PMWA is a mixed question of fact and law. *See Martin v. Selker Bros.*, 949 F.2d 1286, 1292 (3d Cir. 1991). The fact component is the combination of disputed and undisputed facts that comprise the economic relations between the worker and the alleged employer. The law component is the conclusion of whether those facts make a worker an "employee" or "independent contractor." In some cases, one or more genuine issues of fact concerning the relevant economic relations may preclude a trial court from drawing a conclusion as a matter of law on the "employee" or "independent contractor" issue. In those cases the issue would go to trial, with the jury resolving it through either special interrogatories or by deciding the classification issue. *See* Fed. R. Civ. P. 49. But in other cases, as here, the district court may resolve the issue before trial based on undisputed facts in the record. In those cases we do a fresh review on appeal of the court's determination. *Selker Bros.*, 949 F.2d at 1292.

We use a six-factor test to determine whether a worker is an "employee" or an "independent contractor" under the FLSA. *See id.* at 1293. Pennsylvania courts use the same test under the PMWA. *Pa. Dep't of Labor & Indus. v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *aff'd sub nom. Pennsylvania v. Stuber*, 859 A.2d 1253 (Pa. 2004). Those factors are:

> (1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon [her] managerial skill;

12

(3) the alleged employee's investment in equipment or materials required for [her] task, or [her] employment of helpers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanence of the working relationship; [and]

(6) whether the service rendered is an integral part of the alleged employer's business.

*Selker Bros.*, 949 F.2d at 1293; *accord Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1379 (3d Cir. 1985).

Notably, none of these factors asks whether the worker signed an agreement stating that she is an "independent contractor," as Castor required of the dancers here. That is not surprising. The whole point of the FLSA and the PMWA is to protect workers by overriding contractual relations through statute. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945) ("The [FLSA] statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts . . . ."); 43 Pa. Stat. § 333.101 (declaring that employees covered by the protections of the PMWA "are not as a class on a level of equality in bargaining with their employers in regard to minimum fair wage standards, and 'freedom of contract' as applied to their relations with their employers is illusory").

In any event, no one factor is dispositive. Rather, a court should consider them together in the "circumstances of the whole activity" to determine whether the worker is "dependent upon the business to which [she] render[s] service"

or is, "as a matter of economic reality," operating an independent business for herself. *Selker Bros.*, 949 F.2d at 1293 (quoting *DialAmerica*, 757 F.2d at 1382 (internal quotation omitted)).

### i. Employer's right to control the manner in which the work is to be performed

Castor contends the dancers had substantial control over their work. It emphasizes that they (i) set their own hours, (ii) could opt among different shifts with varying stage-rental fees, (iii) decided whether to be Entertainers (requiring a weekly four-shift commitment for lower stage-rental fees) or Freelancers (no weekly commitment but higher stage-rental fees), (iv) determined whether to stay beyond the end of their shifts to continue working, and (v) chose whether to accept or reject requests for private dances.

But beyond these narrow choices made by the dancers, which primarily relate to the shifts they selected, the Club exerted overwhelming control over the performance of their work. It (i) established the available shift times, (ii) checked the dancers' shift attendance and fined them $10 for every 30 minutes they were late, (iii) instructed the dancers on their physical appearance and dictated their choice of dress, hair, and makeup, (iv) determined the songs and number of songs that play when a dancer is dancing, (v) forbade them from smoking, chewing gum, or using their cellphones while on the dance floor, (vi) banned changing into their street clothes before the end of their shifts, and (vii) set the price and duration of all private dances.

On balance, the control factor weighs strongly in favor of "employee" status. *See id.* at 1294 (employer's control over gas station operators shown by findings that owner "set the

14

price[s] of cash sales," visited the gas stations regularly "to oversee its operations," and "controlled the hours of operation and the appearance of the stations"); *see also McFeeley v. Jackson Street Entm't, LLC*, 825 F.3d 235, 241–42 (4th Cir. 2016) (nightclub owner's pervasive control over exotic dancers shown by findings that nightclub reviewed attendance, imposed guidelines on dancers' appearance, set the fees for private dances, instructed dancers on their demeanor and performance, and managed the club's atmosphere and clientele).

### ii. Employee's opportunity for profit or loss depending upon her managerial skill

Castor places significant weight on this factor. Throughout its brief it characterizes the dancers as "entrepreneurs" who "invested" their time and money in shifts at the Club in exchange for the opportunity to make money. It emphasizes that, in a given shift, dancers could make anywhere from profits in excess of $1,600 to a loss (due to paying stage-rental fees and mandatory tip-outs). It argues that each dancer had control over her own profits and losses based on her attraction of followers (through social media platforms, for example) along with "her dancing skills . . . and her skills at creating a fantasy."

But this factor also weighs in favor of employee status. Although each dancer had some degree of control over her profits and losses, "managerial skill"—the relevant factor here—had minimal influence on them. It was the Club, not the dancers, that determined its hours, decided whether to charge admission fees, set the price for drinks and food, determined the length and price of dances on stage and in private rooms, and managed its atmosphere, operations, and advertising. Further, the dancers' skills in "dancing" and "creating a

15

fantasy" are not the kinds of "managerial skills" that can weigh in favor of independent-contractor status. *See Selker Bros.*, 949 F.2d at 1294; *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993) (rejecting argument that exotic dancers' control over their profits through "initiative, hustle, and costume" weighed in favor of independent-contractor status); *McFeeley*, 825 F.3d at 243 (observing that courts have "almost universally rejected" the argument that dancers control their opportunities for losses and profits because they can "hustle" to increase their tips and dance fees).

### iii. Employee's investment in equipment or materials required for her task, or her employment of helpers

Castor argues weakly that dancers "invest" in their trade by paying the Club's stage-rental fees each shift. But this falls in favor of "employee" status. Castor owns and maintains the Club's premises, pays its licensing fees, purchases alcohol for it, and manages, pays and trains its personnel. As Judge Brody noted, courts that have considered similar economic arrangements have all concluded that "a dancer's investment is minor when compared to the club's investment." *3001 Castor*, 2014 WL 2957453, at *8 (quotation omitted) (collecting cases). We reach the same conclusion.

### iv. Whether the service rendered requires a special skill

As noted, Castor maintains that dancers have control over the quality of their performance through their "dancing skills" and "skills at creating a fantasy." The District Court aptly described the skills that contribute to dancers' performance of their "primary job responsibilities [of] topless dances on stage and . . . private dances [for] the club's

16

customers": they should be "fluid" dancers and have good "appearance[,] . . . social skills, [and] hygiene." *Id.* at *9. We refuse to recognize these as "special skills" that weigh in favor of independent-contractor status. Although we have not drawn a bright line between "special" and other skills for purposes of our six-factor test, we do not believe "appearance," "social skills," and "hygiene" qualify. *See Reich*, 998 F.2d at 328 (nude dancers "do not exhibit the skill or initiative indicative of persons in business for themselves"); *see also Hopkins v. Cornerstone Am.*, 545 F.3d 338, 345 (5th Cir. 2008) (holding that managers' "skills to effectively manage their offices and teams . . . are not specialized skills . . . [because] they are abilities common to *all* effective managers" (emphasis in original)).

### v. The degree of permanence of the working relationship

The permanence factor is Castor's strongest. It submitted attendance data showing that dancers at the Club typically are a transient group. The average dancer in the class worked for the Club in only 14 of the 109 workweeks in the class period, and none of the dancers who rented stage time at the Club during the class period rented time slots totaling more than 40 hours in a given week. In addition, throughout the class period the dancers were free to work at other venues, including for Castor's competitors. The District Court was correct to conclude this factor tips to an independent-contractor relationship. Notably, however, the two Circuits who have considered similar circumstances—the Fourth and the Fifth— both assigned little weight to this factor. *See McFeeley*, 825 F.3d at 244; *Reich*, 998 F.2d at 328–29. Castor gives no persuasive reason for us to diverge from those Circuits.

17

### vi. Whether the service rendered is an integral part of the alleged employer's business

The last factor weighs clearly in favor of an employee relationship. Castor markets the Club as an "adult gentleman's club." Its primary offering to customers is topless female dancers who dance on stage and give lap dances in private rooms. (To its credit, Castor does not argue that anyone comes to the Club for the food, drinks, or any reason other than to see the dancers.) They are the providers of that offering. There is no question they render a service that is integral to the Club's business.

\* \* \* \* \*

Having reviewed the six factors, we perform a holistic assessment. Although our judgment is binary—that is, either employee or independent contractor—"the employee/independent contractor distinction is not a bright line but a spectrum." *McFeeley*, 825 F.3d at 241. As the economy evolves, courts continue to grapple with the challenge of placing novel economic relations on the correct point in the spectrum. In many cases that judgment is difficult, and we express sympathy for the district judges making these fact-intensive judgments under such a flexible standard.

But the case before us is not a hard one. Here the dancers' relationship to the Club falls well on the "employee" side of the line. Five of the six factors weigh in favor of concluding the dancers are Castor's "employees." The only factor in Castor's favor—the permanence of the relationship—does not cut so strongly in that direction as to come close to outweighing the other five. Thus we easily conclude the dancers were "dependent upon the business to which they render service." *Selker Bros.*, 949 F.2d at 1293 (quotation

18

omitted).  They were not, as a matter of economic reality, operating independent businesses for themselves.  The District Court correctly ruled they were employees as a matter of law.

### C.  Castor's Preemption Argument

Castor asks us to hold, as a matter of first impression, that the class claims for unjust enrichment under Pennsylvania law are preempted by regulations promulgated by the U.S. Department of Labor under the FLSA.  Its arguments, however, underwhelm.  Castor does not cite any authority for the proposition that the FLSA preempts common-law claims like these.  Nor does it contend with the "congressional intent not to preempt state standards" we have recognized in the FLSA.  *Knepper*, 675 F.3d at 259.  We have rejected similar preemption arguments before, *see id.* at 263, and Castor does not provide any reason to deviate from the general presumption that the FLSA is a parallel regime of wage-and-hour protections that works in cooperation with, not to the exclusion of, other laws protecting workers.  *See id.* at 263.

Congress's recent amendment of the FLSA does not change the analysis.  That occurred in 2018.  Through the amendment, Congress added a cause of action under the FLSA for employees whose tips are taken by their employers.  *See* 29 U.S.C.  § 203(m)(2)(B);  29 U.S.C.  § 216(b)  ("Any employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages.").  Not only was that cause of action unavailable at the time of plaintiffs' trial, but Castor gives us no reason to believe it precludes a similar claim for unjust enrichment.  As with the other provisions of the FLSA, nothing in these new provisions undermines the presumption that the FLSA is meant to supplement, not

supplant, state laws protecting workers. We thus reject Castor's contention that the FLSA preempts plaintiffs' claims for unjust enrichment.

### D. Castor's Request for a Credit or Offset

Castor claims the jury award should have been reduced by the amount of money plaintiffs received directly from customers in the form of dance fees. It concedes that, for the class claims under the PMWA, it does not get a credit or offset for those fees. But Castor maintains an offset should have been applied to plaintiffs' unjust enrichment claims because "it would be unjust and inequitable" to allow them to recover monies for the tips they were forced to pay other Castor employees without giving Castor a credit for the dance fees they retained. In essence, Castor asks us to remake the jury's verdict on damages for unjust enrichment.

We decline. First, Castor does not support its argument with any citations to the record nor any explanation of how we would calculate the amount of credit or offset; by not doing so, it arguably has waived this argument on appeal. *See Norman v. Elkin*, 860 F.3d 111, 129 (3d Cir. 2017) ("For an argument to be preserved on appeal it must be presented together with supporting arguments and citations." (quotation marks omitted)). Second, the argument is not persuasive from an equitable standpoint. The jury and the District Court concluded that Castor was unjustly enriched because it obtained the benefit of the tip-outs that plaintiffs were forced to make to other employees of Castor. It provides no persuasive reason to disturb that conclusion. That Castor did not divert *all* the money plaintiffs received from customers—namely, the dance fees—does not undermine the jury and the District Court's conclusion that plaintiffs were equitably entitled to more than they received. Accordingly, we affirm

the District Court's denial of Castor's post-trial request for an offset or credit.

* * * * *

The District Court had CAFA jurisdiction to try the class's claims under the PMWA and Pennsylvania common law. It also correctly ruled before trial that, as a matter of law, plaintiffs were Castor's employees. We are not persuaded the class's claims for unjust enrichment are preempted by the FLSA, nor is Castor entitled to a credit or an offset of damages for the dance fees the class members earned and received. Hence we affirm in full the challenged rulings of the District Court and sustain the jury's verdict.